IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| CHRISTOPHER BRADLEY HALLMAN, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | Case No. CIV-16-903-BMJ |
| NANCY A. BERRYHILL, Acting Commissioner of Social Security Administration, | ) | |
| Defendant.[1] | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Christopher Bradley Hallman seeks judicial review of the Social Security Administration's denial of supplemental security insurance (SSI). Pursuant to 28 U.S.C. § 636(c), the parties have consented to the exercise of jurisdiction over this matter by a United States Magistrate Judge. The Commissioner has answered and filed the Administrative Record, and both parties have briefed their respective positions. For the reasons stated below, the Court reverses the Commissioner's decision and remands the matter for further proceedings.

**I.** **Procedural Background**

Plaintiff received SSI based on childhood disability until he turned eighteen years old. Administrative Record (AR), [Doc. No. 11], 11. At that time, Plaintiff was re-evaluated for disability under the rules for determining disability in adults. *Id.* On March 21, 2013, the State

---

[1] Pursuant to Fed. R. Civ. P. 25(d), the Court substitutes Nancy A. Berryhill, Acting Commissioner of Social Security Administration, as the proper Defendant in this action.

Agency determined on initial review that Plaintiff was no longer disabled as of March 14, 2013. *Id.* The initial decision was upheld on reconsideration. *Id.*

At Plaintiff's request, an administrative law judge (ALJ) held a video hearing on June 25, 2014. AR 33-69. Plaintiff represented himself at the hearing. The ALJ issued an unfavorable decision on November 25, 2014, AR 11-25. On appeal, the Social Security Appeals Council denied Plaintiff's request for review. AR 1-5. Thus, the ALJ's decision became the final decision of the Commissioner and is the subject of this judicial review.

## II.     The ALJ's Decision

The ALJ followed the sequential evaluation process required by agency regulations. *See Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005) (explaining five-step sequential evaluation process); *see also* 20 C.F.R. § 416.920. The ALJ first determined Plaintiff had never engaged in substantial gainful activity. AR 13.

At step two, the ALJ listed Plaintiff's severe impairments: pes planus; left leg instability due to prior injury; gastroesophageal reflux disease (GERD); intermittent explosive disorder; depressive disorder; and learning disorder. *Id.* Additionally, the ALJ found a history of asthma, eczema and seizures but determined these conditions were not severe because Plaintiff had had no recent exacerbations of asthma, had no skin rash or lesions, and was not taking medication for seizures. *Id.*

At step three, the ALJ found none of Plaintiff's impairments meets or medically equals any of the presumptively disabling impairments listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. AR 13-14. The ALJ evaluated Plaintiff's pes planus and left leg instability under Listing 1.02 A, his GERD under Listing 5.00, and his mental disorders under Listings 12.02, 12.04, 12.06 and 12.08. AR 14.

At step four, the ALJ determined Plaintiff's residual functional capacity (RFC):

> After careful consideration of the entire record, the undersigned finds that since March 14, 2013, the claimant has had the residual functional capacity to lift and carry 10 pounds occasionally and less than 10 pounds frequently. The claimant can sit for about 6 hours during an eight-hour workday and can stand and walk for at least 2 hours during an eight-hour workday. The claimant can occasionally climb, balance, stoop, kneel, crouch, and crawl. The claimant is to avoid concentrated exposure to dusts, fumes, gases, odors, and poor ventilation, and hazards such as unprotected heights and heavy machinery. The claimant can understand, remember, and carry out simple, routine and repetitive tasks. The claimant can respond appropriately to supervisors, co-workers, and usual work situations, but have no contact with the general public.

AR 15.

At step five, the ALJ relied on the testimony of a vocational expert (VE) in determining Plaintiff can perform jobs existing in significant numbers in the national economy including small parts assembler, hand cutter, and cuff folder. AR 24. Thus, the ALJ found Plaintiff not disabled at step five of the sequential evaluation process.

### III. <u>Standard of Review</u>

Judicial review of the Commissioner's final decision is limited to determining whether the factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied. *See Poppa v. Astrue*, 569 F.3d 1167, 1169 (10th Cir. 2009). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003) (quotation omitted). A decision is not based on substantial evidence if other evidence in the record overwhelms it, or if there is a mere scintilla of evidence supporting it. *Branum v. Barnhart*, 385 F.3d 1268, 1270 (10th Cir. 2004). The court "meticulously examine[s] the record as a whole, including anything that may undercut or detract from the ALJ's findings to determine if the substantiality test has been met." *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009) (citations omitted). While the court

considers whether the ALJ followed the applicable rules of law in weighing particular types of evidence in disability cases, the court does not reweigh the evidence or substitute its own judgment for that of the Commissioner. *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008) (quotations and citations omitted).

## IV.   Issues Presented for Judicial Review

Plaintiff challenges the ALJ's RFC formulation, contending it does not precisely reflect Plaintiff's mental limitations from intermittent explosive disorder or his physical limitations from pes planus. Plaintiff further contends the ALJ erred in failing to consider Plaintiff's obesity in combination with other disorders.

Plaintiff's challenge to the ALJ's mental RFC is dispositive and requires reversal and remand. The ALJ's conclusion that Plaintiff has the ability to "respond appropriately to supervisors, co-workers, and usual work situations," despite his mental impairments consisting in part of intermittent explosive disorder, is not supported by substantial evidence in the record as a whole. The two opinions in the record supporting the ALJ's mental RFC are from non-examining, State agency medical sources who based their opinions on limited medical evidence. Their opinions regarding the severity of Plaintiff's mental impairments do not constitute substantial evidence to support the ALJ's decision because they are overwhelmed by evidence to the contrary.

Because this error requires reversal and remand, the Court need not consider the ALJ's analysis of Plaintiff's physical impairments, his failure to consider Plaintiff's obesity, or his determination that Plaintiff can perform work at the sedentary exertional level.

## V.   Analysis

The administrative record contains evidence from different kinds of medical sources regarding Plaintiff's mental impairments and resulting functional limitations. The evidence

includes a Psychological Evaluation and diagnoses from an examining consultative psychologist; a Mental Residual Functional Capacity Assessment (MRFC) and a Psychiatric Review Technique form (PRT) from a non-examining State agency medical doctor; a MRFC and PRT form from a non-examining State agency psychologist; and a Medical Source Statement of Ability to do Work-Related Activities (Mental), a Mental Status Form, along with contemporaneous treatment notes from Plaintiff's mental health provider. As discussed in further detail below, the ALJ's decision regarding the existence of Plaintiff's severe mental impairments is supported by substantial evidence. But the ALJ's decision regarding the severity of Plaintiff's mental impairments is not so supported.

### A. Diagnoses by the Consultative Psychologist

Heidi Holeman Kamm, Ph.D., a licensed psychologist, conducted a consultative psychological evaluation of Plaintiff at the request of the State agency on March 11, 2013. AR 309. The results of Plaintiff's mental status examination were not impressive. The results revealed marginal awareness of current events ("I know Wrestlemania's coming") and questionable social judgment and comprehension. Dr. Kamm observed Plaintiff had "minor observable problems with focus" as well as problems with recall and fund of knowledge. AR 311.

Plaintiff reported problems managing his anger. He told Dr. Kamm he blacks out when he is in a rage and has no memory afterwards of what happened. He acknowledged there are numerous holes in the walls of his room, but stated he does not remember punching or kicking the wall. His grandmother, with whom he lives, reported Plaintiff also punches himself in the head and hits his head on the wall when he is angry. Additionally, both reported Plaintiff's paranoia and excessive worry. AR 310.

5

Dr. Kamm diagnosed Plaintiff with Intermittent Explosive Disorder (IED), Depressive Disorder and Learning Disorder ("by report"). AR 312. She further found he had problems related to social environment and assessed a Global Assessment of Functioning score (GAF) of 55.[2] Dr. Kamm suggested further psychoeducational evaluation to gain a better perspective of Plaintiff's current intellectual functioning. AR 311.[3]

The ALJ adopted Dr. Kamm's diagnoses. Based on the results of Dr. Kamm's examination, the ALJ found Plaintiff's severe impairments included IED,[4] depressive disorder and learning disorder. AR 13.

---

[2] The GAF is a subjective determination based on a scale of 0 to 100 of "the clinician's judgment of the individual's overall level of functioning." *American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders* (DSM) (Text Revision 4th ed. 2000), 32. GAF scores were commonly used at that the time Dr. Kamm examined Plaintiff. A GAF score of 51–60 indicates "moderate symptoms," such as a flat affect, or "moderate difficulty in social or occupational functioning." *Id.* at 32. But the most recent edition of the DSM omits the GAF scale "for several reasons, including its conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice." *American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2013), 16.

[3] Because the record does not reflect further testing, the Commissioner should consider ordering such tests on remand if she finds Plaintiff's mental functional impairments do not preclude work activities.

[4] IED is characterized by unpremeditated, recurrent behavioral outbursts manifested by verbal or physical aggression, the magnitude of which is grossly out of proportion to the provocation or to any precipitating psychosocial stressors. The outbursts either cause distress in the individual or impair occupational or interpersonal functioning, or are associated with financial or legal consequences. IED is a proper diagnosis if the recurrent outbursts are not better explained by another mental disorder. DSM-V, 466-467.

The ALJ's reliance on Dr. Kamm to diagnose Plaintiff's mental impairments complied with Agency regulations. As Dr. Kamm is an "acceptable medical source," as defined in the regulations,[5] her diagnoses established the existence of Plaintiff's mental impairments.

**B. Opinions Regarding Severity of Plaintiff's Mental Impairments**

But the ALJ ran afoul of the regulations in his consideration of the evidence from three medical sources regarding the severity of Plaintiff's mental impairments: evidence from Plaintiff's mental health provider; evidence from a State agency physician; and evidence from a State agency psychologist.

In this case, the Plaintiff's treating mental health provider was Jennifer Zachary, APRN-CNP. The ALJ described Ms. Zachary as a family nurse practitioner, Board certified in psychiatric/mental health nursing. AR 22. As reported by Ms. Zachary, Plaintiff had previously been treated by a Dr. Heller who had diagnosed Plaintiff with attention deficit hyperactivity disorder (ADHD) and oppositional defiant disorder (ODD).[6] AR 365. After further treatment, Ms. Zachary also diagnosed Plaintiff with schizoaffective disorder and personality disorder.[7] AR

---

[5] The term "medical source" refers to both "acceptable medical sources" and other health care providers who are not "acceptable medical sources." *See* 20 C.F.R. § 416.902. Relevant to this action, "acceptable medical sources" include licensed physicians and licensed or certified psychologists. *See* 20 C.F.R. § 416.913(a).

[6] ODD, like IED, is categorized as an impulse control or conduct disorder. "While other disorders in DSM-5 may also involve problems in emotional and/or behavioral regulation, the disorders in this chapter are unique in that these problems are manifested in behaviors that violate the rights of others (e.g., aggression, destruction of property) and/or that bring the individual into significant conflict with societal norms or authority figures."
*See* http://dx.doi.org/10.1176/appi.books.9780890425596.dsm15 (last accessed May 25, 2017).

[7] APRN Zachary's diagnosis differs from that of Dr. Kamm who diagnosed IED rather than schizoaffective disorder. The functional limitations resulting from Ms. Zachary's diagnosis do not, however, necessarily conflict with the functional limitations that would result from Dr. Kamm's diagnosis of IED. According to the DSM, IED is diagnosed when the recurrent aggressive outbursts are not better explained by another mental disorder. DSM-V, 466.

7

365-366. In a typical treatment note, Ms. Zachary described Plaintiff as "very angry in general" with a history of abuse and abandonment since birth. She notes he was born addicted to cocaine. Ms. Zachary completed two statements describing the severity and limiting effects of Plaintiff's mental impairments. AR 363, 401-403. She typically rated Plaintiff's GAF at 58.

In a Mental Status Form dated June 24, 2013, Ms. Zachary described Plaintiff as paranoid, because he believed people were looking at him and talking about him. For that reason, she stated, he preferred to stay home and play video games and had little interest in other activities. Ms. Zachary's prognosis was not promising; she stated her opinion that Plaintiff had probably reached his full potential and would need long-term therapy and medication management. Although she believed he could perform simple tasks, Ms. Zachary stated Plaintiff became easily frustrated when attempting complex tasks. As for dealing with work situations and authority, Ms. Zachary stated Plaintiff finds it "extremely difficult" to adjust to any authority and becomes angry and violent when frustrated or paranoid. She did not believe Plaintiff had the ability to manage his own funds. AR 363.

In a more detailed Medical Source Statement of Ability to Do Work-Related Activities (Mental), dated July 14, 2014, Ms. Zachary indicated Plaintiff has moderate limitations in understanding and carrying out simple tasks; marked limitations in understanding and carrying out complex tasks; and extreme limitations in the ability to make judgments on simple or complex work-related decisions. In her opinion, Plaintiff is "unable to work with authority figures; angers easily, [and] cannot complete tasks without angry episodes." AR 401. She rated Plaintiff as extremely limited in his ability to interact appropriately with the public, supervisors and co-workers, or respond appropriately to usual work situations and changes in routine work setting. The factors underlying Ms. Zachary's ratings are Plaintiff's inability to adjust to changes in routine

because of his propensity to anger and become aggressive and because he becomes paranoid in large groups. She stated his mind is constantly racing and worrying. She noted he does not sleep well. Ms. Zachary had treated Plaintiff for two years when she completed the Medical Source Statement. AR 402.

The evidence from Ms. Zachary is largely consistent with the diagnoses of Dr. Kamm. But the ALJ gave Ms. Zachary's opinions "little weight" despite her status as Plaintiff's treating mental health provider. AR 23. To support the weight he afforded her opinions, the ALJ relied in large part on the GAF scores Ms. Zachary had assessed. The ALJ concluded the GAF scores indicated only moderate to mild symptoms and were "certainly not indicative of many marked to extreme limitations she assessed." AR 23. But the ALJ's use of GAF scores to determine, in effect, Plaintiff's non-disability does not constitute substantial evidence.

As discussed *supra* n. 2, the American Psychiatric Association has abandoned the use of GAF scores in its latest publication of the DSM-V. Moreover, the Commissioner has declined to endorse the GAF scale for "use in the Social Security and SSI disability programs," and has indicated that GAF scores have no "direct correlation to the severity requirements of the mental disorders listings." 65 Fed. Reg. 50746, 50746–65 (2000). GAF scores have always been considered no more than a snapshot of a patient's functioning at the time of examination and never determinative of overall disability. *See Kornecky v. Commissioner of Soc. Sec.*, 167 F. App'x 496, 511 (6th Cir. 2006) (noting "according to the DSM's explanation of the GAF scale, a score may have little or no bearing on the subject's social and occupational functioning"). Moreover, as the SSA has found, the GAF scale "does not have a direct correlation to the [paragraph B criteria] in our mental disorders listings." *See* Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50, 746; 50, 765–65 (Aug. 21, 2000).

9

Furthermore, in Administrative Message 13066 ("AM–13066"), the SSA explained the shortcomings of a GAF rating:

> [A] GAF needs supporting evidence to be given much weight. By itself, the GAF cannot be used to "raise" or "lower" someone's level of function. The GAF is only a snapshot opinion about the level of functioning. It is one opinion that we consider with all the evidence about a person's functioning. Unless the clinician clearly explains the reasons behind his or her GAF rating, and the period to which the rating applies, it does not provide a reliable longitudinal picture of the claimant's mental functioning for a disability analysis.

*See* Soc. Sec. Admin., Global Assessment of Functioning (GAF) Evidence in Disability Adjudication, AM–13066 (July 22, 2013) REV (Oct. 14, 2014); *see also Tilles v. Commissioner of Social Security*, 2015 WL 1454919 at *33 (S.D.N.Y. Mar. 31, 2015); *Brannon v. Colvin*, 2015 WL 4479708, at *4 (M.D. Tenn. Jul. 21, 2015) ("The problem with using the GAF to evaluate disability is that there is no way to standardize measurement and evaluation. Some clinicians give inflated or unrealistically low GAF ratings because the GAF rating instructions in the DSM–IV–TR are unclear ... [this] can lead to improper assessment of impairment severity.") (*quoting* AM–13066).

Additionally, the ALJ erred in relying on only selected portions of Dr. Kamm's report to discount the evidence provided by APRN Zachary:

> [T]he psychiatrist[8] reported the claimant evidenced no apparent problems with alertness or focus. He was friendly with the examiner and answered all questions in a relevant and appropriate manner. His speech was logical and goal directed. His affect was euthymic. There were no indications of paranoia, response to internal stimuli, or presence of delusions.

AR 23. Dr. Kamm's description of Plaintiff's demeanor during the consultative examination does not, however, constitute substantial evidence to support the ALJ's rejection of Ms. Zachary's

---

[8] Dr. Kamm is a licensed psychologist, not a psychiatrist. AR 312.

10

conclusion that Plaintiff could not relate appropriately to supervisors or co-workers or complete tasks without angry episodes. "[T]he very nature of an intermittent explosive disorder is that it is, in fact, *intermittent*, and thus it punctuates what otherwise might be unremarkable conduct. *Overton v. Astrue*, 2010 WL 5363000 at *2 (C.D. CA Dec. 20, 2010) (emphasis added) (internal citation omitted). Moreover, the Commissioner is not allowed to "pick and choose among medical reports, using portions of evidence favorable to his position while ignoring other evidence." *Hardman v. Barnhart*, 362 F.3d 676, 681 (10th Cir. 2004) (citation omitted).[9]

The ALJ erred in affording "great weight" to the opinions of the two State agency, non-examining medical sources who completed MRFC and PRT forms. On March 15, 2013, Dr. Sally Varghese diagnosed Plaintiff with "personality disorders." AR 318. She rated Plaintiff as moderately limited in restrictions of daily living; maintaining social functioning; and maintaining concentration, persistence and pace. She found Plaintiff had had one or two episodes of decompensation, each of extended duration, but she included no description of these episodes. AR 328. Despite the "moderate" limitations she assessed, Dr. Varghese found Plaintiff's allegations credible. AR 330. In her MRFC assessment, Dr. Varghese found Plaintiff markedly limited in the ability to understand, remember and carry out detailed instructions and in the ability to interact appropriately with the general public. AR 314-315. However, she found no significant limitations in the ability to accept instructions and respond appropriately to criticism from supervisors. AR 315. In her summary, Dr. Varghese found:

---

[9] Additionally, the ALJ erred in failing to use the factors set out in 20 C.F.R. § 416.927(c) in weighing APRN Zachary's opinion. Those factors include: length of the treatment relationship and the frequency of examination; nature and extent of the treatment relationship; supportability; consistency; specialization; and other factors. They are applicable to opinions of both "acceptable medical sources" and other medical sources.

11

> He reports difficulty with anger management and becoming physically destructive, therefore he should avoid working with the general public. He is able to perform simple routine tasks, and relate to others for work purposes.

AR 316. Dr. Varghese does not explain why Plaintiff's "personality disorder" would not preclude him from being able to "relate to others for work purposes" when it prevents him from working with the general public.

On July 12, 2013, Ron Cummings, Ph. D. completed a second set of PRT and MRFC forms. AR 385-397. He assessed Plaintiff with organic mental disorders (ADHD), affective disorders (depression), anxiety related disorders (social anxiety) and personality disorders (IED). AR 385-392). Dr. Cummings' MRFC is allegedly based on "work history and objective observations by medical sources." But Plaintiff had no work history, and Dr. Cummings did not identify the "medical sources" upon which he relied or why he relied on those sources.

Dr. Cummings determined Plaintiff "is capable of adjusting to a work environment that does not require good social skills[,]" but he also noted Plaintiff "[m]ay require more than typical level of supervision initially." Ultimately, Dr. Cummings suggested Plaintiff could "perform tasks independently once tasks are learned." AR 383. In his summary, Dr. Cummings states:

> Claimant can perform simple tasks with routine supervision. Claimant can relate to supervisors and peers on a superficial work basis. Claimant cannot work effectively with the general public but can tolerate incidental contact at a superficial level. Claimant can adapt to a work situation.

*Id.*

The ALJ relied on these opinions of non-examining State agency physicians in determining the severity of Plaintiff's mental health impairments. But under the regulations, the opinions of examining sources are generally afforded more weight than the opinions of non-examining sources. 20 C.F.R. § 416.927. It is true that Plaintiff's mental health provider is not an "acceptable medical source." *See* 20 C.F.R. § 416.902. But the ALJ is charged with considering and weighing

every medical opinion in a claimant's record. Even though only "acceptable medical sources" can provide evidence to establish the *existence* of a medically determinable impairment, *see* 20 C.F.R. § 416.913(a), the opinions of "other sources," including nurse practitioners, may provide evidence "to show the *severity* of [a claimant's] impairment(s) and how it affects [a claimant's] ability to work." 20 C.F.R. § 416.913(d) (emphasis added).

The Agency promulgated Social Security Ruling 06-03p (SSR 06-03p), 2006 WL 2329939 (Aug. 9, 2006) to "clarify how [it] consider[s] opinions from sources who are not 'acceptable medical sources[.]'" SSR 06–03p at *1. Recognizing the growth of managed healthcare in recent years and the increased use of medical sources who are not technically "acceptable medical sources," the Ruling states that "[o]pinions from these medical sources ... are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." *Id.* at *3.

The factors for weighing the opinions of "acceptable medical sources" set out in 20 C.F.R. § 416.927(d) apply equally to "all opinions from medical sources who are not 'acceptable medical sources.'" *Id.* at *4. Thus, depending on the facts in a case, an opinion from a medical source who is not an "acceptable medical source" may outweigh the opinion of an "acceptable medical source," even when that acceptable medical source is also a treating source. For example, it may be appropriate to give more weight to the opinion of a medical source who is not an "acceptable medical source" if he or she has seen the individual more often than the acceptable medical treating source and has provided better supporting evidence and a better explanation for his or her opinion. *Id.* at *5. Such is the situation in this case.

In sum, the ALJ's mental RFC is not supported by substantial evidence in the record as a whole. On remand, the ALJ should carefully consider all medical source opinions and weigh them

using the appropriate factors. Accordingly, this matter must be reversed and remanded for further consideration consistent with this Memorandum Opinion and Order.

## VI.     Conclusion

For the reasons set forth, the Court reverses the decision of the Commissioner and remands the matter for further proceedings consistent with this Memorandum Opinion and Order.

ENTERED this 5th day of June, 2017.

_____
BERNARD M. JONES
UNITED STATES MAGISTRATE JUDGE